RENDERED: APRIL 29, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0631-WC

ALICE JOLLY                                                                APPELLANT


|  | ON APPEAL FROM COURT OF APPEALS |  |
| --- | --- | --- |
| V. | NO. 2019-CA-0397 |  |
|  | WORKERS' COMPENSATION BOARD |  |
|  | NO. WC-17-01582 |  |


LION APPAREL, INC.,                                                        APPELLEES
JONATHAN WEATHERBY,
ADMINISTRATIVE LAW JUDGE, AND
WORKERS' COMPENSATION BOARD


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**REVERSING**

Alice Jolly (Ms. Jolly) appeals the decision of the Court of Appeals holding that her employer, Lion Apparel, filed a timely appeal with the Worker's Compensation Board (The Board). The sole issue presented by this appeal is whether Lion Apparel's second petition for reconsideration was sufficient to toll its deadline to file an appeal. After review, we reverse.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not disputed. Nevertheless, a brief recitation of the facts is necessary to provide context for the legal issue to be addressed.

On September 18, 2017, Ms. Jolly filed two applications for resolution of a claim (Form 101) with the Department of Workers' Claims. In one of the Form 101s, she alleged an acute injury to her lumbar spine that occurred on August 8, 2016. In the other, she alleged an injury to her cervical spine. Specifically, she asserted a "[c]umulative trauma injury to [her] neck from twisting," and that the date of the injury was January 1, 2016. The two claims were consolidated and heard by the Administrative Law Judge (ALJ). The ALJ ultimately dismissed her lower back injury claim and this case solely concerns her cumulative trauma neck injury claim.

Ms. Jolly began working for Lion Apparel in 2011 as a seamstress. Her duties included sewing coats that weighed nearly 200 pounds when completed; the coats were utilized by firefighters, the Coast Guard, and the Navy. She worked Monday through Friday from 7:30 a.m. to 4:30 p.m. Ms. Jolly stopped working at Lion Apparel in August of 2016 after her lower back injury, and was subsequently terminated on March 21, 2017.

Ms. Jolly was deposed at Lion Apparel's request on November 9, 2017. While her Form 101 claimed that her date of injury was January 1, 2016, Ms. Jolly testified that her neck issues actually began sometime around early 2015 or late 2014 when Melissa Frederick, APRN, referred her to Dr. Phillip Tibbs:

> **Q.** Then it looks like you also had treated with Dr. Phillip Tibbs…it looks like on June 26, 2015; is that correct?
>
> **A.** For my neck, yes.
>
> **Q.** And that was for a neurosurgical consultation?
>
> **A.** I guess.

**Q.** Who referred you on that date in June of 2015?

**A.** Melissa Frederick.

**Q.** On that date do you recall complaining of neck pain for the past eight months?

**A.** Yes.

**Q.** What caused the neck pain to be present for eight months prior to that date?

**A.** They didn't say.  It just started hurting.

**Q.** So you woke up and it started hurting one day?

**A.** No.  It was hurting at work and a big knot come (sic) up on my neck and that's when I went to Melissa because I kept headaches.

[…]

**Q.** So your neck was bothering you three to four months before January 2016?

**A.** Back of my neck and head up in here, but down in here is when it started when I went for the x-ray and stuff, when the knot come (sic) up.

**Q.** When was that?

**A.** I don't remember.  It's whatever day I went to Melissa and got x-rays done.  I don't remember the date and stuff.

**Q.** Do you think it was in 2016?  Was it after you had headaches?

**A.** Yeah.  It was 2016 when the knot popped up and [I] started having real (sic) bad stiff neck and headache.

**Q.** And this was after your neurosurgical consultation with Dr. Tibbs, approximately a year ago?

**A.** No.  That was before then.

**Q.** I know.  So, your neurosurgical consultation was in June of 2015?

3

**A.** Well, that's when it was then.

**Q.** So, that was before that?

**A.** Yeah. Because I went to Melissa for headaches and that knot on my neck and that's when she sent me to Tibbs.

**Q.** And at that neurosurgical consultation, you were complaining of neck pain that had been present for eight months prior to that. But now you're saying that this neck pain started three to four months prior to the date of the injury in January of 2016; is that correct?

**A.** It was whenever [Melissa] sent me to the doctor. I don't remember what the year, the date and stuff was. All I remember is before she sent me to Tibbs.

**Q.** I'm just trying to figure out when you began treating for your neck in relation to this injury that you're alleging on January—

**A.** That's when I went to Melissa and she sent me to Tibbs.

**Q.** And I'm just trying to get the dates straight. Before you said it was October, November of 2016 and now you're saying that it was when you had the neurosurgical consultation in 2015?

**A.** I went to Melissa and she sent me to Tibbs, so it was in 2015 instead of '16. '16 is when I hurt my [lower] back.

**Q.** So, when did the neck pain start? Was it three to four months before the alleged date of the injury in January 2016 or was it years before?

**A.** No. It was just a few months before that I started taking headaches before [Melissa] sent me to Tibbs.

**Q.** Okay. Who else did you treat with in relation to your neck?

**A.** Nobody.

A treatment report from Melissa Frederick dated January 15, 2015, stated that the reason for the appointment was "Headache knot on back of neck" and that "Patient here today [complains of] neck pain feels like knot on

4

back of neck, no known injury." The report noted that an x-ray of Ms. Jolly's cervical spine was ordered.

A treatment report from Dr. Tibbs dated June 26, 2015, stated that Ms. Jolly was referred to him by Melissa Frederick. The report noted that Ms. Jolly had been experiencing "neck pain that radiates to her head the past 8 months. This was insidious in onset...MRI of the cervical spine shows central disk herniation at C3-4 and C5-6 causing moderate stenosis...Ms. Jolly appears to be suffering from cervical migraine headaches."

On March 18, 2018, Ms. Jolly filed a motion to amend the date of her cervical spine injury from January 1, 2016, to January 15, 2015. In support of her motion, she argued:

> [Ms. Jolly] testified and the medical records indicate, including the IME[1] report of Dr. Henry Tutt,[2] that [Ms. Jolly] developed a knot on her neck on [January 15, 2015]. This was the first indication that [Ms. Jolly] had developed cervical spine problems. Despite Dr. Craig Roberts' characterization of a "manifestation date" occurring on [January 1, 2016], the medical record indicates that [Ms. Jolly's "onset" date was [January 15, 2015].

Lion Apparel objected to the motion. It argued that "[t]he records merely contain a history that [Ms. Jolly] felt a 'knot' in her neck" and that there "was no indication of any connection to her work activities." Lion Apparel further asserted that Ms. Jolly's request would be time barred under the applicable statute of limitations. The ALJ granted Ms. Jolly's motion to amend and added

---

[1] Independent Medical Evaluation.

[2] Dr. Tutt's IME discussed the treatment reports from Melissa Frederick and Dr. Tibbs as recounted *supra*.

the date of the injury and the statute of limitations argument to the list of issues to be addressed.

The formal hearing on Ms. Jolly's claim was conducted on May 17, 2018. The ALJ considered Ms. Jolly's previous deposition testimony and her live testimony at the hearing as well as numerous medical records by several treating physicians. The ALJ's opinion and award was entered on July 12, 2018. In his summary of the evidence, the ALJ recounted:

> 2. [Ms. Jolly] said that she worked seven-hour [shifts] and explained that she developed a knot in her neck and was seen by Dr. Frederick.[3] She recalled that she informed her supervisor, Brenda Mullins, about the knot and the headaches that she was having, but that no incident report was filled out. She said that Dr. Frederick referred her to Dr. Tibbs because she believed it was a bulging disc and degenerative discs. She said that she had epidural injections in her neck in 2015 but that she has never had a doctor tell her that her neck complaints were due to work. She said that she continues to have neck pain and headaches and has not had any type of surgery for her cervical spine. Her claim was amended to add an injury date of January 2015 due to cumulative trauma of her neck injury related to her work activities.
>
> 12. The medical records of Dr. Craig Roberts were introduced into evidence on behalf of [Ms. Jolly]. [Ms. Jolly] was seen for an independent medical evaluation on August 2, 2017. After performing a physical examination, reviewing medical records, and diagnostic studies, Dr. Roberts diagnosed cervical disc herniation C3-4, C4-5, C5-6 due to the cumulative trauma which manifested on or around January 1, 2016[.]

The ALJ's findings of fact and conclusions of law concerning Ms. Jolly's neck injury are as follows:

---

[3] Ms. Jolly testified that Dr. James Frederick is her family physician. The records from Dr. Frederick's office indicate that Melissa Frederick worked in Dr. Frederick's office as an APRN.

6

19. [Ms. Jolly] testified that she developed pain in her neck but that she was not initially told that it was causally work-related when her symptoms appeared in January of 2015.

20. The ALJ notes that Dr. Roberts diagnosed cervical disc herniation C3-4, C4-5, C5-6 due to the cumulative trauma which became manifest on or around January 1, 2016.

21. The ALJ finds that the manifestation date of [Ms. Jolly's] cervical spine injury is January 1, 2016, and that notice was given in a timely manner thereafter. The ALJ further finds that the claim was filed within the applicable statutory limitations period per the manifestation date found herein.

Based upon Dr. Roberts' findings, the ALJ found that Ms. Jolly had an 18% whole person impairment to her cervical spine. Dr. Roberts further opined that Ms. Jolly reached maximum medical improvement (MMI) on July 1, 2016, and that she would be unable to return to the same kind of work she was engaged in previously. The ALJ relied solely on Dr. Roberts' findings to determine that Ms. Jolly was entitled to "temporary total disability [TTD] benefits from the date of the injury, January 15, 2015, through July 1, 2016." The ALJ also issued an award of permanent partial disability (PPD) benefits beginning January 15, 2015, and suspended for all periods TTD benefits were owed.

Following the ALJ's opinion and award rendered on July 12, 2018, Lion Apparel filed its first petition for reconsideration (PFR) on July 23. The PFR was denied by the ALJ on August 16. Lion Apparel then filed a second PFR on August 22, which was likewise denied by the ALJ on September 18.

Lion Apparel subsequently filed an appeal of the ALJ's opinion and award and denial of both of its PFRs to the Board. Lion Apparel filed its notice of appeal on October 8, which was well-outside the thirty-day window

7

permitted by 803 Kentucky Administrative Regulation (KAR) 25:010[4] to file an appeal to the Board. It is here that the issue we are tasked with addressing arose. Ms. Jolly filed a motion to dismiss Lion Apparel's appeal to the Board as untimely. Ms. Jolly, citing *Tube Turns Div. of Chemetron v. Quiggins*,[5] argued that because Lion Apparel's second PFR raised precisely the same allegations of error as its first PFR, its appeal was time barred. In response, Lion Apparel argued that "[a] second Petition for Reconsideration was necessitated by the fact-finder's failure to issue findings of fact to support the award of TTD."

The Board, relying solely upon *Uninsured Emp'r's Fund v. Stanford*,[6] held that when Lion Apparel filed its second PFR, it tolled the time Lion Apparel had to file its appeal notwithstanding the fact that its second PFR failed to raise a new allegation of error. Ms. Jolly filed a motion to reconsider, which was denied. The Board addressed the parties' arguments on the merits and entered an opinion vacating the ALJ's opinion and award and remanding. The Board directed that "on remand, the ALJ is directed to provide the additional findings of fact regarding Jolly's cervical injury requested by Lion Apparel." The Board also held that the ALJ's award of TTD benefits from January 15, 2015, through July 1, 2016 (Ms. Jolly's date of MMI) was inappropriate because Ms. Jolly

---

[4] "Within thirty (30) days of the date a final award, order, or decision rendered by an administrative law judge pursuant to KRS 342.275(2) is filed, any party aggrieved by that award, order, or decision may file a notice of appeal to the Workers' Compensation Board." 803 KAR 25:010 section 22(2)(a).

[5] 574 S.W.2d 901 (Ky. App. 1978).

[6] 399 S.W.3d 26 (Ky. 2013).

8

continued to work for Lion Apparel during that time frame. Ms. Jolly agreed that the TTD award was improper on those grounds.

The Court of Appeals subsequently affirmed the Board. The Court of Appeals agreed with Jolly's argument that Lion Apparel's second PFR was "clearly improper" under *Quiggins*, as it "merely rehashed arguments [Lion Apparel] believed the ALJ did not adequately address in his order denying its first petition to reconsider."[7] Nonetheless, the court held that Lion Apparel's appeal should not have been dismissed as untimely. The Court of Appeals, like the Board, primarily relied upon *Stanford* in support of its holding.[8]

Ms. Jolly now appeals to this Court. Consequently, we must address the following: first, was Lion Apparel's second PFR improper? And, if so, did Lion Apparel's improper second PFR toll its deadline to file an appeal with the Board?

Additional facts are discussed below as necessary.

## II.   ANALYSIS

### A. Standard of Review

The Court of Appeals conducts a review of the Board with the purpose of "[correcting] the Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice."[9]

---

[7] *Jolly v. Lion Apparel, Inc.*, 2019-CA-000397-WC, 2019 WL 4732511, at *2 (Ky. App. Sept. 27, 2019).

[8] *Id.* at *2-*3.

[9] *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687–88 (Ky. 1992).

9

Subsequent review of the Court of Appeals and the Board by this Court is meant "to address new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude."[10]  The facts of this case are not in dispute, and our analysis concerns only what is required under the law for a timely appeal.  We therefore, review this issue *de novo* and give no deference to the decisions below.[11]

## B. Lion Apparel's second PFR was improper under *Quiggins.*

As a preliminary matter, the statute governing PFRs in worker's compensation claims is KRS[12] 342.281.  It directs:

> Within fourteen (14) days from the date of the award, order, or decision any party may file a petition for reconsideration of the award, order, or decision of the administrative law judge.  The petition for reconsideration shall clearly set out the errors relied upon with the reasons and argument for reconsideration of the pending award, order, or decision.  All other parties shall have ten (10) days thereafter to file a response to the petition.  The administrative law judge shall be limited in the review to the correction of errors patently appearing upon the face of the award, order, or decision and shall overrule the petition for reconsideration or make any correction within ten (10) days after submission.

Additionally, the filing of a notice of appeal within the applicable time limit is mandatory and jurisdictional.[13]  In other words, if Lion Apparel's appeal was untimely, the Board lacked the requisite jurisdiction to address its appeal.

---

[10] *Id.* at 688.

[11] *See, e.g.*, *Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 631 (Ky. 2018).

[12] Kentucky Revised Statute.

[13] *See Johnson v. E. Coal Corp.*, 401 S.W.2d 230, 231 (Ky. 1966).

10

As previously discussed, Ms. Jolly relies upon *Tube Turns Div. of Chemetron v. Quiggins* in support of her position that Lion Apparel's appeal should have been dismissed as untimely. In *Quiggins*, the Board[14] entered an award for the employee, Kenneth Quiggins (Quiggins), on June 21, 1976.[15] The Board found he was entitled to "17% Occupational disability for a period of 425 weeks with medical expenses to be paid by the employer, not to exceed $3,500."[16]

The day after the order and award was entered, Quiggins filed a petition for reconsideration. In it, he alleged two errors: (1) the restriction of his payments to 425 weeks; and (2) the award did not state the dollar amount for his weekly benefits.[17] Quiggins requested that the following paragraph be added to the award:

> That the plaintiff, Kenneth Quiggins, shall recover of the defendant, Tube Turns, for 17% Occupational disability, or the sum of $19.51 from December 16, 1974, so long as he is disabled, together with interest at the rate of 6% per annum on all past due and unpaid installments of any such compensation, and said defendant shall take credit upon this Award for any weekly compensation heretofore paid to the plaintiff.[18]

---

[14] We note that *Quiggins* is from a time before the utilization of ALJs. Claimants therefore went before the Board initially and then appealed a decision of the Board to the Court of Appeals.

[15] *Quiggins*, 574 S.W.2d at 902.

[16] *Id.*

[17] *Id.*

[18] *Id.*

On July 12, 1976, the Board amended its original order awarding benefits in the exact manner requested by Quiggins in his petition.[19]

On July 22, 1976, Quiggins filed a second petition for reconsideration.[20] This time, he argued that *Apache Coal Co. v. Fuller,* 541 S.W.2d 933 (Ky. 1976), a case that was not yet final, would entitle him to $28.00 of weekly benefits instead of $19.51.[21] On August 9, the Board entered an order passing on Quiggins' motion until *Apache Coal* became final. Thereafter, on March 22, 1977, the Board sustained Quiggins' second petition for reconsideration. The Board amended its original order of award to increase Quiggins' weekly benefits to the sum of $28.00. Quiggins' employer appealed.

The issue before the Court of Appeals was "whether an aggrieved party may file a second petition for reconsideration more than 14 days after the date of the first award but within a period of 14 days from the entry of the Board's corrective order and award."[22] It held:

> Neither [KRS 342.281] nor the Board's regulations extend the time or provide for the filing of a petition for reconsideration more than 14 days after the date of the award, which means the original order, award or decision and the date of its entry. **We do not construe the statute as permitting a party to file a petition for reconsideration or, in effect, a second petition for reconsideration more than 14 days from the date of the original award, except where the subsequent order contained an error not present in the original award and, therefore, could**

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

12

**not have been raised by the first petition for reconsideration**.[23]

> Additionally, the mere fact that a new appellate decision, that may be prospectively favorable to the appellee, has appeared is not enough to permit the filing of a second petition for reconsideration after the right to file the petition for reconsideration has been lost.[24]

The Court of Appeals reversed the Board and remanded the case with orders that the Board reinstate its July 12 amended order.[25]

Thus, *Quiggins* clearly established that an aggrieved party may not file a second PFR more than fourteen days after the date of the ALJ's original award unless the ALJ's order denying that party's first PFR contained an error that was not present in the original opinion and award and therefore could not have been raised in the first PFR.

Here, Lion Apparel's second PFR did not raise any allegations of error that could not have been raised in its first PFR, nor did the ALJ's order ruling on the first PFR create an error not present in his original opinion and award.

Lion Apparel's first PFR raised numerous alleged errors appearing on the face of the ALJ's opinion and award. Specifically: that Ms. Jolly's neck condition was long-standing as evinced by medical records from Drs. Frederick and Tibbs that show Ms. Jolly complained of neck pain as early as 2013; that, apart from Dr. Robert's IME, there was no credible evidence that her neck

---

[23] *Id*. at 903 (emphasis added).

[24] *Id*.

[25] *Id*.

condition was work-related; that there was no evidence she was unable to work due to her neck pain; that there was no evidence that her neck injury was a cumulative trauma injury; that the findings regarding the manifestation date were insufficient; and that the award of TTD and PPD benefits was improper. Of particular relevance to the case at bar, it argued:

> The ALJ has found that [Ms. Jolly] suffered a cervical spine condition that became manifest on January 1, 2016. The ALJ has failed, however, to reconcile the facts that [Ms. Jolly] was seen and treated for neck pain for three years prior to the manifestation date. The ALJ has further failed to consider that [Ms. Jolly] never missed time from work for neck pain. [Lion Apparel] submits that additional findings of fact are necessary to support a manifestation date of January 1, 2016. [Lion Apparel] requests findings of fact as to whether [Ms. Jolly] suffered non-work-related cervical disc disease prior to January 1, 2016, as evinced by the treatment records of Drs. Frederick and Tibbs.

> Furthermore, the ALJ improperly issued an award of benefits beginning January 15, 2015. The ALJ has improperly issued an award of TTD benefits to [Ms. Jolly] for the period of January 15, 2015 though July 1, 2016. The award of TTD benefits is improper for two reasons. First, the ALJ found that [Ms. Jolly's] alleged neck injury became manifest on January 1, 2016. If January 1, 2016 is the injury date, [Ms. Jolly] is not entitled to any award of benefits for a period prior to January 1, 2016.

> More importantly, [Ms. Jolly] did not prove entitlement to TTD benefits for her alleged neck injury…[Ms. Jolly] did not file any evidence to demonstrate that she was incapable of performing her customary work prior to the date on which she reached MMI on July 1, 2016. In fact, the uncontroverted evidence confirms that [Ms. Jolly] worked regular duty from January 1, 2016 through July 1, 2016. She is not entitled to any TTD benefits as a result of the alleged cervical spine condition. [Lion Apparel] submits that there is a patent error appearing on the face of the Opinion, Order, & Award and respectfully requests an order correcting a finding that [Ms. Jolly] did not meet her burden of proving entitlement to TTD.

In her response to Lion Apparel's PFR, Ms. Jolly disagreed with all of Lion Apparel's allegations of error save for one: she agreed that there was an error

14

with the calculation of TTD benefits. Specifically, she "[requested] the ALJ to revisit the calculation of TTD as it does appear that the wrong dates were inserted into the award."

The ALJ denied Lion Apparel's PFR. The ALJ's order states in its entirety:

> This matter is before the ALJ upon the Petition for Reconsideration filed by [Lion Apparel] seeking clarification of the Award issued for cumulative trauma to the cervical spine. Having reviewed the
>
> Petition, and the Response thereto, the following additional findings are entered:
>
> 1. The ALJ again finds that [Ms. Jolly] credibly described her cervical spine symptoms and that said symptoms are also supported by the diagnostic imaging that revealed a large cervical disc herniation on the left side.
>
> 2. The ALJ relies upon Dr. Roberts who credibly diagnosed a cervical disc herniation at C3-4, C4-5, and C5-6 due to cumulative trauma and assessed an 18% whole person impairment. The ALJ finds therefore that [Ms. Jolly] sustained a work-related injury to the cervical spine and that the mechanism of injury is cumulative trauma.
>
> 3. The ALJ finds that [Ms. Jolly] satisfied her burden to establish a harmful change to the human organism as a result of work. [Lion Apparel's] Petition is therefore hereby **DENIED**.

We note that at this point in the proceedings, Lion Apparel had sufficiently preserved its arguments regarding the ALJ's alleged errors by virtue of its first PFR. It therefore could have immediately appealed to the Board. But rather than doing so, it filed another PFR. Contrary to Lion Apparel's argument to this Court, its second PFR did not raise any new allegations of

15

error that could not have been raised in its initial PFR. By way of demonstration, it argued:

> [Lion Apparel] incorporates by reference herein its original Petition for Reconsideration and prior request for additional findings of fact with regard to the nature and onset of [Ms. Jolly's] alleged neck injury. More specifically, for purpose of the Petition for Reconsideration, [Lion Apparel] again submits that additional findings of fact are required to support the extensive award of TTD benefits issued to [Ms. Jolly].

> The ALJ concluded that [Ms. Jolly's] alleged neck injury became manifest on January 1, 2016. However, [Ms. Jolly] amended her claim to assert an injury date of January 1, 2015. While the ALJ found that [Ms. Jolly] provided due and timely notice of an injury date of January 1, 2016, the ALJ did not make any findings on the issue of notice and limitations as it pertains to the amended injury date of January 1, 2015.

> [Lion Apparel] respectfully submits that there exist multiple patent errors appearing on the face of the [original opinion and award] and [the order ruling on the first PFR]. [Lion Apparel] respectfully submits that it was legal error for the ALJ to fail to consider the medical records of [Ms. Jolly's] treating doctors, who documented neck pain beginning in 2013. It was legal error for the ALJ to refer to injury dates of January 1, 2016 and January 15, 2015 without making sufficient findings of fact for any party to discern when the ALJ believes the injury happened and whether [Ms. Jolly] gave notice and timely filed her claim. Moreover, it was legal error for the ALJ to render an award of benefits to [Ms. Jolly] commencing January 15, 2015.

The ALJ denied Lion Apparel's second PFR on the basis that it "[failed] to cite patent error."

Accordingly, because Lion Apparel's second PFR failed to raise any new allegations of error appearing on the face of the ALJ's ruling on Lion Apparel's first PFR, it was clearly improper under *Quiggins*. We must next determine

16

whether Lion Apparel's appeal to the Board was timely notwithstanding the impropriety of its second PFR.

## C. Lion Apparel's appeal to the Board was untimely.

Both the Board and the Court of Appeals relied on *Uninsured Emp'r's Fund v. Stanford,* to conclude that Lion Apparel's appeal was timely. In *Stanford,* the claimant employee, Matthew Stanford, (Stanford), participated in a summer job program administered by the Bluegrass Area Development District (Bluegrass).[26] The program was called "By Learning U Earn" (BLUE).[27] The U.S. Army Cadet Corp., Inc. (USACC) applied, and was accepted, to be a participating BLUE worksite.[28] Bluegrass and USACC entered into an agreement allowing individuals participating in BLUE to work at the USACC's campus.[29]

Prior to participating in the BLUE program, Stanford volunteered with USACC as a cadet counselor.[30] After Stanford began participating in BLUE, he continued to be a cadet counselor for USACC.[31] Stanford was therefore simultaneously living on the USACC campus working as a cadet counselor and participating in the BLUE program through Bluegrass.[32]

---

[26] *Stanford,* 399 S.W.3d at 28.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 28-29.

[32] *Id.* at 29.

17

During a trip that Stanford took with USACC cadets he was tragically injured after falling from a zipline.[33]  Stanford was rendered a quadriplegic from the fall, and all parties stipulated that he was permanently and totally disabled.[34]  Stanford sought workers' compensation benefits.[35]

An ALJ granted Stanford benefits.[36]  The ALJ found that USACC was Stanford's primary employee, and that USACC was a subcontractor of Bluegrass.[37]  The ALJ therefore held that Bluegrass was an up-the-ladder contractor and would be liable for workers' compensation payments to Stanford in the event that USACC was unable to pay.[38]  And, because USACC did not carry workers' compensation insurance, Bluegrass would be responsible for the payments.[39]

Nearly all the parties filed petitions for reconsideration.[40]  But, for our purposes, we need only address Stanford's petitions.[41]  Stanford filed a petition for reconsideration "contending that the ALJ erred in finding there were no outstanding unpaid medical bills."[42]  The ALJ denied this petition.[43]  Stanford

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

then filed a second petition for reconsideration "arguing again that the ALJ erred regarding the unpaid medical bills."[44]  The ALJ denied the second petition because it found that it sought the same relief asked for in Stanford's first petition for reconsideration.[45]

Both Bluegrass and USACC appealed to the Board after the ALJ denied Stanford's second PFR.[46]  USACC contested the ALJ's finding that it was Stanford's employer.[47]  But the Board "dismissed USACC's appeal as untimely because it was filed based on the timing of Stanford's second petition for reconsideration."[48]  The Board reasoned:

> Stanford admitted in the second petition for reconsideration that he was seeking the same relief he
>
> sought in his first petition for reconsideration. Successive petitions for reconsideration seeking the same relief are not permitted.  Had the petition been filed [within] 14 days of the original opinion or had the second petition dealt with a patent error in the order ruling on the first petition for reconsideration, such a petition would be proper.  Here, the second petition was filed more than 14 days after the date of the original decision and the second petition did not address a new error contained in the order ruling on the first petition for reconsideration.  Thus, the second petition for reconsideration was not a timely petition addressing the original decision of the ALJ.  Since the second petition was not a timely petition and did not address an error first occurring in the order ruling on the first petition for reconsideration, it did not destroy the finality of the order ruling on the first petition for

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 30.

19

reconsideration.  *Tube Turns Division of Chemetron v. Quiggins*, 574 S.W.2d 901 (Ky. App. 1978).  Because the petition for reconsideration was improper, the ALJ's order on the second petition for reconsideration was a nullity.  Based upon the foregoing, USACC's appeal to the Board was not timely.[49]

The Court of Appeals later affirmed the Board's finding that USACC's appeal was untimely.[50]  USACC appealed to this Court arguing that its appeal was timely.

In addressing the timeliness issue, this Court noted first that USACC argued that "the Board's reasoning is flawed because it requires a party prior to filing an appeal to review any second or subsequent petition for reconsideration **filed by another party** to determine whether it will result in a ruling from the ALJ or if it is a nullity."[51]  This Court agreed with USACC's argument and held:

> The plain language of KRS 342.285(1) allows a party to file an appeal from the order of an ALJ once that order is final and no petition for reconsideration is pending.
>
> As soon as Stanford filed the second petition for reconsideration, it stayed the finality of the ALJ's order and award and tolled the time for a party to file an appeal.  It is unimportant that Stanford's second petition for reconsideration failed to raise a new allegation of error.  The validity of Stanford's second petition for reconsideration could only be determined by the ALJ and it is only after he has either dismissed or ruled on the petition that a party can say with any certainty that the petition was meritless or as the Board put it, a "nullity."  **It is unfair to place the burden of guessing the success or validity of a**

---

[49] *Id.* (internal citation omitted).

[50] *Id.*

[51] *Id.* at 30-31 (emphasis added).

> **subsequent petition for reconsideration upon the opposing party**.[52]

Notwithstanding, the *Stanford* Court then went on to agree with Bluegrass' argument regarding the timeliness of USACC's appeal. The Court stated:

> Bluegrass argues that the Board's ruling in this matter "perpetuates an orderly appellate process." They argue that holding that USACC's appeal was timely will create a slippery slope because it allows a party to destroy the finality of opinions and orders by the filing of successive petitions for reconsideration requesting identical relief. A party would presumably do this to improperly extend their time to file an appeal. **We agree with Bluegrass, but only to the extent that the party filing the successive petitions for reconsideration is the party filing an appeal**. **In this matter it was Stanford who filed the improper petition for reconsideration and USACC should not be punished for Stanford's action**.[53]

Based on the Court's belief that "USACC should not be punished" for Stanford's filing of an improper second petition for rehearing, it held that the Court of Appeals erred by dismissing USACC's appeal as untimely.[54]

Accordingly, the *Stanford* Court distinguished between two procedural circumstances that can arise from the improper filing of a second petition for reconsideration. The first situation, which occurred in *Stanford*, is that the party that filed the improper second PFR was **not** the same party whose appeal

---

[52] *Id*. at 31 (emphasis added) (internal citation omitted).

[53] *Id*. (emphasis added).

[54] *Id*.

was found to be untimely based on the timing of the improper second PFR. The *Stanford* Court properly held that when that occurs, it would be unfair to find that the appealing party's appeal was untimely based on the improper filing of a **different party's** PFR. The second situation, that did not occur in *Stanford*, is that the party that filed the improper second PFR is **the same party** whose appeal is found to be untimely because of its second PFR. In which case, of course, it would not be unfair, nor error, to hold that the party's appeal was untimely. Though, to be clear, in the latter circumstance, if the second PFR was proper under *Quiggins*, it would toll that party's time to file an appeal. But that is not the situation we have before us.

Both the Board and the Court of Appeals ignored the distinction drawn by the *Stanford* Court, believing it was "mere dicta."[55] Though dicta it may be, it is consistent with both *Quiggins* and common sense to draw such a distinction. For example, if we were to follow the holding of the Court of Appeals, an employer could theoretically continue filing improper PFRs to prolong the process and purposefully deplete an employee's financial resources or to improperly extend its own deadline to file an appeal. It would also render *Quiggins* a nullity: why require that a second PFR raise a new issue not appearing on the face of the ALJ's original order and award if there are no consequences for violating that requirement? We therefore now explicitly adopt the distinction as discussed in *Stanford*. Specifically, if a party files a second

---

[55] *Jolly*, 2019 WL 4732511, at *3.

22

PFR that is improper under *Quiggins* more than fourteen days after the ALJ's original opinion and award, and the same party thereafter appeals to the Board, that appeal is untimely.

In this case, Lion Apparel was the party that filed the improper second PFR outside the fourteen-day window of KRS 342.281, and it was also the party that sought an appeal. Therefore, under *Stanford*, *Quiggins*, and our holding today, its appeal to the Board was untimely. The Board accordingly did not have jurisdiction to hear the appeal, and it should have dismissed it.

## III. CONCLUSION

Based on the foregoing, we reverse the Court of Appeals. The ALJ's opinion and award is hereby reinstated.

Minton, C.J.; Conley, Hughes, Keller, Lambert, and VanMeter, J.J. sitting. Nickell, J., not sitting. Minton, C.J.; Conley, Hughes, Keller, Lambert, and VanMeter, J.J., concur.


COUNSEL FOR APPELLANT:

James Delano Howes
Law Office of James Howes


COUNSEL FOR APPELLEE, LION APPAREL:

Lyn Douglas Powers
Fulton, Devlin & Powers, LLC


23

COUNSEL FOR APPELLEE, WORKERS' COMPENSATION BOARD:

Michael W. Alvey

ADMINISTRATIVE LAW JUDGE:

Hon. Jonathan R. Weatherby